IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **NICHOLAS MORROW,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **METROPOLITAN NASHVILLE OF DAVIDSON COUNTY, TENNESSEE, et al.,** <br><br> **Defendants.** | ) | **NO. 3:19-cv-00351** <br><br> **JUDGE CAMPBELL** <br> **MAGISTRATE JUDGE HOLMES** |

**MEMORANDUM**

Pending before the Court are three motions: a Motion for Summary Judgment by Nicholas Carroll, Marcus Darden, Andrew Kooshian, Nicholas Kulp, Brittany McElwee, Jedidayah Merriweather, Edin Plancic, Ryan Storm, and Tommy Widener[1] (Doc. No. 106); a Motion for Summary Judgment by the Metropolitan Government of Nashville and Davidson County ("Metro") (Doc. No. 107); and a Motion for Partial Summary Judgment by Plaintiff Nicholas Morrow (Doc. No. 124). The motions are fully briefed.

For the reasons stated herein, Defendants' Motions will be **GRANTED**, and Plaintiff's Motion will be **DENIED**.

## I. FACTUAL BACKGROUND

The claims in this case arise from Plaintiff's encounter with Metro police officers on April 29, 2018.

[1] For ease of reference, the Court refers to these individuals collectively as "Officer Defendants." The "Supervising Officers" refers to Captain Widner, Sergeant Kulp, and Sergeant Kooshian. The "Subordinate Officers" refers to Sergeant McElwee, Officer Merriweather, Officer Plancic, Officer Storm, Officer Darden, and Officer Carroll.

## A. Plaintiff's Facebook Posts

Shortly before 2:00 p.m. on April 29, 2018, Plaintiff posted the following to his personal Facebook page:

> The VA have Murdered Veterans.
> The Metro and Smyrna Police have Murdered Citizens.
> Auto Masters is an organized criminal enterprise colluding with police to arrest citizens of the USA
> Nashville State have stolen stolen [sic] from Tennesseans.
> They ALL Have robbed Tennessee blind.
> And…
> I can prove it in court.
> Federal Crimes happen in Nashville every single day
> We were distracted by the injustice.

(Doc. No. 123-7 PageID# 2454). Kimberly Cates, a friend of Plaintiff who had attended both high school and college with Plaintiff, responded with words of encouragement, to which Plaintiff replied, "Keep tuned…I got some surprises [winking face][winking face]" (*Id.*; Doc. No. 135 ¶1). Ms. Cates replied with additional encouragement, and Plaintiff responded, "keep watchin…" and "at 4pm Nashville will change." (*Id.*). Plaintiff contends that he was planning on announcing at 4:00 p.m. his decision to run for governor. (Pl. Dep., Doc. No. 108-1 PageID# 745)

## B. Police Phone Calls and Dispatch

At approximately 3:00 p.m., Chase Taylor called the police to express his concerns about Plaintiff's Facebook posts. (Doc. No. 135 ¶¶ 3, 12; Doc. No. 108-3 PageID# 839). Mr. Taylor told police that Plaintiff had previously threatened one of his professors at Nashville State Community College and that Plaintiff was scheduled to take an exam at the school at 4:00 p.m. that day. (Doc. No. 135 ¶ 6). Ms. Cates also spoke with dispatch and told them that Plaintiff was a military veteran with severe PTSD and that, based on his Facebook posts, she was concerned about Plaintiff's mental state. (*Id.* ¶¶ 12, 14, 15).

Following these calls, Metro Dispatch sent a bulletin to patrol officers, relaying to them that Plaintiff was a military veteran with "severe PTSD" who was posting concerning comments on Facebook. (*Id.* ¶ 8). The bulletin also specifically notified officers of the "at 4pm Nashville will change" comment, Mr. Taylor's assertion that there was a scheduled exam at Nashville State at 4:00 p.m. that day, and that Plaintiff had previously threatened a Nashville State professor, Ian Bourgoine. (*Id.* ¶¶ 8-9; Doc. No. 108-3 PageID# 839). Though it was later determined that there was not an exam taking place that day, the parties agree that this is the information that police dispatchers received from Mr. Taylor and then relayed to Metro officers. (Doc. No. 135 ¶¶ 6, 9). Officers were also advised that Plaintiff had threatened police in the past and had access to weapons in his house. (*Id.* ¶ 27).

Sergeant Brittany McElwee and Officer Marcus Darden subsequently spoke with Ms. Cates in person. (*Id.* ¶¶ 17, 19). Ms. Cates told the officers that she believed Plaintiff's posts were threats against Professor Ian Bourgoine because the professor had embarrassed Plaintiff in class and that she was concerned about Plaintiff's mental state. (*Id.* ¶¶ 14-15, 19-20).

**C. Police Conduct at Plaintiff's Residence**

Officers from the South and Midtown precincts were dispatched to Plaintiff's residence. Officers knocked on the front door, and upon receiving no answer, went around the house to knock on the back door. (*Id.* ¶ 29). Officers could hear noise inside, but no one answered their attempts at contact. (*Id.* ¶¶ 29, 36). Plaintiff was aware that the Officers were trying to make contact with him but ignored them. (*Id.*). While officers tried to contact him, Plaintiff continued to post on Facebook about the police, veterans, the Tennessee Code Commission, and that "the government is committing a crime Right now…" (*Id.* ¶ 38). Officers then set up a perimeter around Plaintiff's residence until a member of the Mobile Crisis Unit could contact Plaintiff. (*Id.* ¶ 41).

The Mobile Crisis Unit is a department of Metro's Mental Health Cooperative. (*Id*. ¶ 48). They perform immediate mental health assessments for individuals who are having or are suspected of having mental health crises, including homicidal or suicidal ideations or psychotic episodes. (*Id*. ¶ 48; Yarbrough Dep., Doc. No. 108-9, PageID# 930). When Mobile Crisis counselor Ashley Yarbrough arrived on the scene, she and her supervisor collected information, contacted Ms. Cates and Mr. Bourgoine, spoke with Plaintiff's mother, and attempted to speak with Plaintiff. (*Id*. ¶ Yarbrough Dep., PageID# 930-36, 45). The Mobile Crisis counselor reported that Plaintiff's mother seemed concerned about Plaintiff's behavior. (*Id*.). Based on all of the information gathered at the scene, the Mobile Crisis counselor determined that Plaintiff required a mental health evaluation and signed a 6-401 Form, which instructs law enforcement to produce the identified individual for a mental health evaluation. (Id. PageID# 936-37; Doc. No. 135 ¶ 53). Such evaluations take place on location, and the counselor determines, by conducting an interview, if the individual needs to be transported to a mental health facility. (*Id*.).

Officers were informed that the Mobile Crisis counselor had requested the Plaintiff be produced for an on-site mental health evaluation. (Doc. No. 135 ¶¶ 54-55). Officers maintained their perimeter around Plaintiff's house. (*Id*. ¶ 56). Plaintiff's mother informed the officers that Plaintiff had access to weapons in the house, at least one of which was already loaded and kept on the mother's nightstand. (*Id*. ¶ 56).

At approximately 8:43 p.m., Plaintiff opened the back door of the residence to let his dog out. (*Id*. ¶ 59). The dog began barking at the officers in the yard. (*Id*.). Sergeant McElwee attempted to gain control of the dog. (*Id*. ¶ 60). Plaintiff emerged from the house and began yelling at the officers to leave his dog alone.[2] (*Id*. ¶ 62). Plaintiff yelled profanities at the officers and waved his

[2] In his Second Amended Complaint, Plaintiff alleges that one of the officers grabbed his dog and jerked its legs at an "unnatural angle" causing the dog injury. (Doc. No. 39 ¶ 36). In their Statement of

arms frantically. (*Id.*). With weapons pointed at Plaintiff, officers ordered him to step off the porch because he was being detained. Plaintiff ignored their orders and attempted to re-enter the house. (*Id.* ¶ 63). Officer Darden deployed his taser, striking Plaintiff in the back. (*Id.* ¶ 64). Plaintiff was then handcuffed and brought to a squad car where the Mobile Crisis counselor attempted an interview. (*Id.* ¶¶ 67-68). Based on Plaintiff's statements, which were characterized as "grandiose and delusional," the Mobile Crisis Counselor determined that Plaintiff needed a mental health evaluation from a physician. (*Id.* ¶ 69). She filled out a 6-404 Form to that effect, which requires that the subject be transported to a hospital for this second evaluation, and Plaintiff was transported to Vanderbilt University Medical Center. (*Id.* ¶¶ 68-70).

Plaintiff brings claims against Metro, Captain Widner, Sergeant Kooshian, and Sergeant Kulp under 42 U.S.C. § 1983 for unreasonable seizure and excessive use of force in violation of his Fourth Amendment rights (Count I); and retaliation for protected speech in violation of his First Amendment rights (Count II). Plaintiff's final remaining claim is a state-law trespass claim against the Subordinate Officers.[3] Defendants move for summary judgment on all claims. Plaintiff has moved for summary judgment on his Fourth Amendment claims and his trespass claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

Undisputed Material Facts, Defendants state: "Segreant McElwee did not harm the dog or engage in any physically abusive conduct towards the dog." (Doc. No. 135 ¶ 61). Plaintiff did not respond to this statement. Accordingly, it is considered undisputed for purposes of summary judgment. (*See* Fed. R. Civ. P. 56(e)(2)).

[3] Counts IV and V of Plaintiff's Second Amended Complaint brought claims against Vanderbilt University Medical Center for false imprisonment and negligence *per se*. Vanderbilt University Medical Center moved for summary judgment on these claims, and the Court granted their motion. (*See* Doc. Nos. 155, 156).

56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.* "The moving party is entitled to summary judgment when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.'" *Goodman v. J.P. Morgan Investment Management, Inc*., 954 F.3d 852, 859 (6th Cir. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich*., 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather the Court determines whether sufficient evidence has been presented to make the issue of a material fact a proper jury question. *Id*. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the non-moving party. *Rodgers*, 344 F.3d at 595.

## III. ANALYSIS

Plaintiff brings claims for constitutional violations under 42 U.S.C. § 1983 and one state law trespass claim. Section 1983 provides that "an individual may bring a private cause of action

against anyone who, acting under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) (citations omitted). The Officer Defendants assert qualified immunity on all claims.

Qualified immunity protects government officials from civil damages "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Reich v. City of Elizabethtown, Ky*., 945 F.3d 968, 977 (6th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). The doctrine of qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id*. at 978 (internal quotations omitted) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). Once raised by the defendant, the plaintiff bears the burden to show qualified immunity does not apply. *Id*; *see also Gambrel v. Knox Cty, Kentucky*, 25 F.4th 391, 399 (6th Cir. 2022). The Court may address the prongs in any order. *Id*. Applying these standards, the Court will now address each of Plaintiff's claims in turn.

**A. Fourth Amendment Claims**

Plaintiff claims that his Fourth Amendment rights were violated when police officers entered his property, set up a perimeter, tased him, and detained him for a mental health evaluation. His Fourth Amendment claims are against the Supervising Officers under a theory of supervisory liability. He does not bring any Fourth Amendment claims against the officers that were present in his yard or the officer that tased him. Plaintiff argues that Sergeants Kulp and Kooshian are liable because they instructed the Subordinate Officers to set up a perimeter and Captain Widner is liable because he instructed the Subordinate Officers to detain the Plaintiff after the Mobile

Crisis counselor determined that Plaintiff should be produced for a mental health evaluation. Plaintiff states that the Supervising Officers are generally liable for excessive use of force.

1. Constitutional Violation

a. Unreasonable Seizure

Plaintiff claims that he was subject to an unreasonable seizure in violation of his Fourth Amendment rights when officers entered his property without a warrant and without probable cause, detained him for a mental health evaluation, and tased him in the back in order to detain him. Plaintiff addresses the probable cause requirement in the frame of an arrest for criminal activity. However, the requirements in the context of a mental health seizure are slightly different.

"The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). However, in the context of mental health seizure, "only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior" is required. *Id*. (citing *Illinois v. Gates*, 462 U.S. 213, 245 n. 13 (1983)). When examining the existence of probable cause, courts are "cautioned that probable cause is a fluid concept," "requiring courts to evaluate the facts known to officers from the perspective of a reasonable and objective person in those officers' position." *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 563 (6th Cir. 2016) (internal quotations omitted).

The material facts are not in dispute. Officers were dispatched to Plaintiff's home following reports that Plaintiff was a veteran with severe PTSD who was making threatening comments on Facebook. The callers also linked the threat about 4:00 p.m. to a specific event and location—an exam at the school—and articulated a reason for their concern—Plaintiff's prior threats against a professor. Officers further had reports of Plaintiff barricading himself in this residence with

weapons two years earlier. They also spoke with Plaintiff's mother who told them that Plaintiff was upset and that he had told her "he was going to take care of the Nashville State problem the only way he knew how" and had asked her to leave the residence that day so that she wouldn't be involved in what he had planned. (Doc. No. 135 ¶ 45; Doc. No. 108-9 Page ID# 945). Despite efforts by both the officers and the Mobile Crisis counselor, Plaintiff refused to communicate with the people gathered outside the house and instead continued to post his rhetoric on Facebook.

Under the circumstance presented in this case, the Court finds that the officers had probable cause to believe that Plaintiff was a danger to himself or others. The Sixth Circuit's decisions in *Monday* and *Zucker* are particularly informative here. In *Monday*, the court found that probable cause existed to seize the plaintiff for a mental health evaluation, notwithstanding his claims that he had not overdosed on Xanax, when his behavior raised concerns that he "was attempting to commit suicide, or at least might injure himself if not taken to a hospital." 118 F.3d at 1104. In *Zucker*, officers received reports from the plaintiff's daughter and another witness that the plaintiff was in a manic state and had a firearm. 643 F. App'x at 565. In that case, officers were also informed by a previous encounter with the plaintiff that raised concerns about his mental health. The Sixth Circuit found, under those circumstances, that probable cause existed to seize the plaintiff for evaluation.

Several of these factors are presented in the instant case. Officers had a previous encounter with Plaintiff, during which he was detained for mental health treatment. His mother confirmed that he had access to at least one loaded firearm. The police had statements from at least three people stating that Plaintiff was suffering from mental health issues and had directly threatened the professor and posted cryptic comments on social media, which the witnesses viewed as threats. When confronted with these facts, a reasonable officer would have found a probability that

Plaintiff would engage in dangerous behavior. Accordingly, because there was probable cause for Plaintiff's detention, there is no constitutional violation here.

Plaintiff's arguments that police could not have reasonably believed that Plaintiff was a danger to himself or others are unavailing. Plaintiff argues that officers seized him without probable cause and that the decision to detain him was based on speculation and premonition from third parties. However, "[n]othing in the Fourth Amendment prohibits an officer from relying on a third party's observation when ascertaining whether probable cause to conduct a seizure exists, so long as it would be reasonable to conclude that the third party is reliable." *Zucker*, 643 F. App'x at 565. There is neither evidence nor argument that any of the witnesses were unreliable or that the officers should have found their reports unreliable.

Plaintiff also argues, without citation to any applicable authority, that the officers' fear of dangerous behavior was "irrational" and that probable cause dissipated when 4:00 p.m. passed and no harm had occurred. Such assertions are unpersuasive and also seem to be plainly contradicted elsewhere in Plaintiff's briefing. For example, while Plaintiff takes umbrage with the presence of officers around the perimeter of the house, he also states that because the police had the house surrounded "there was no possible way for Morrow to travel anywhere to harm anyone" and therefore there was no possibility of harm. (Doc. No. 124 at 13). He asserts that officers lacked probable cause because there was no way for Plaintiff to harm Professor Bourgoine because "the professor was across town." (Doc. No. 142 at 5). The Court cannot reconcile these and other contradictory arguments and non sequiturs, but regardless, unsupported arguments and bare assertions are insufficient to show that the officers lacked probable cause to detain Plaintiff for a mental health evaluation.

Finally, Plaintiff contends that the officers erred by deriving their probable cause from the form signed by the Mobile Crisis counselor. He equates the form to a "psychological arrest warrant" and then argues that it does not meet the standards of an arrest warrant. The Court declines to consider this argument, which is comprised of misconstrued arguendo and devoid of legal support. In doing so, the Court notes that this is not a case in which Plaintiff was arrested for criminal activity. Rather, plaintiff was detained for a mental health evaluation. These events are not the same, and Plaintiff's attempts to equate them are unpersuasive and unsupported by either the facts of the case or any citations to authority.

b. Excessive Force

The Court next turns to Plaintiff's claim of excessive use of force. Defendants assert qualified immunity on this claim as well, but also move for summary judgment on the grounds that no evidence has been presented to support Plaintiff's claim of supervisory liability on this issue. In response, Plaintiff "agrees and concedes that [the Supervising Officers and Metro] are not liable for 'excessive' force under the Fourth Amendment" but "regardless of whether the supervisors or the City are personally responsible for any *excessive* force, they are still responsible for wrongly using *force* (excessive or not) by seizing" Plaintiff. (Doc. No. 136 at 3) (emphasis in original). The Court considers the statement to be an abandonment of that claim, but to the extent that it is not, the Court will consider the claim under the qualified immunity analysis.[4]

[4] The best the Court can gather from Plaintiff's short and contradictory paragraphs on this issue is that Plaintiff contends that the use of the taser was force but not excessive force. Excessive force is not an ever-fixed mark or scale on which the party moves up and down. Excessive is a qualifier of the force used in a particular instance. What is excessive in a given situation is determined by the specific facts in a particular instance. *See Smith v. City of Troy, Ohio*, 874 F.3d 938, 943 (6th Cir. 2017) ("In order to comply with the Fourth Amendment, an officer's use of force must be objectively reasonable under the totality of the circumstances."); *see also Bell v. Wolfish*, 441 U.S. 520, 559 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.")

Officers seizing a citizen are prohibited from using excessive force by the Fourth Amendment. *Monday*, 118 F.3d at 1104. This is true in the context of mental health seizures as wel. *See id*. "[E]ven when an officer has probable cause to seize an individual, the officer must employ a reasonable amount of force when effecting the seizure." *Id*. "The reasonableness of a particular seizure must be evaluated by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.'" *Zucker*, 643 F. App'x at 568 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In making this the determination, context is important. "[T]he governmental interests at stake must be evaluated through the lens of 'an officer on the scene making split-second judgments and without the advantage of 20/20 hindsight." *Id*. (quoting *Goodrich v. Everett*, 193 F. App'x 551, 555 (6th Cir. 2006)).

In this case, officers had been informed that Plaintiff was suffering from severe PTSD, had ready access to at least one loaded firearm, had threatened police officers in the past, was behaving erratically, and had refused to exit his home or speak with anyone outside for hours. When Plaintiff finally did emerge from the house, officers instructed him from their positions several feet away to come to them and informed him that he was being detained. Plaintiff ignored their commands, shouted at them from the porch, gestured frantically, and turned to go back into the house. Officer Darden tased Plaintiff in the back to prevent him from re-entering the house where he reportedly had access to weapons.[5]

---

[5] In his Second Amended Complaint, Plaintiff alleges that an officer kicked him after he had been tased, breaking his arm. Plaintiff does not discuss any such conduct in his motion or in his responses to the Defendants' motions. There is likewise nothing in the statements of undisputed material facts that references Plaintiff being kicked or an injury to his arm. Plaintiff does not raise the alleged injury to his arm as grounds for his Fourth Amendment claim for excessive force, nor has he presented any evidence of it. Accordingly, the alleged injury to Plaintiff's arm is not considered in the Court's analysis.

Plaintiff has not presented any argument or authority stating that the force used under these circumstances was excessive or unreasonable. Neither has he rebutted the Defendants' claim to the contrary. By failing to do so, he has not met his burden to show that there was a constitutional violation. *See Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) ("If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, she will have failed to carry her burden."). Accordingly, the Court cannot find a constitutional violation for Plaintiff's claim of excessive use of force.

In sum, the Court finds that Plaintiff has failed to show that the Supervising Officers violated his constitutional rights. Because Plaintiff has not carried his burden, the Supervising Officers are entitled to qualified immunity on Plaintiff's Fourth Amendment claims for unreasonable seizure and excessive use of force.

2. Clearly Established

Even if the Court is in error in finding the absence of a constitutional violation, Plaintiff has failed to show that the right was clearly established. "A right is clearly established if the contours of that right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) (cleaned up) (internal quotations omitted). In other words, "existing case law, 'must have placed the statutory or constitutional question beyond debate.'" *Reich v. City of Elizabethtown, Ky.*, 945 F.3d 968, 981 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Plaintiff's response to the Supervising Officers' assertion of qualified immunity is as follows:

> The same arguments for why the Police Defendants are liable for violating the Constitution, as already presented, would also apply to the issue of qualified immunity. The only difference is the legal standard employed, whereas a higher degree of culpability must be shown to beat qualified immunity. Morrow submits

> that in general the case law is quite clear that probable cause was non-existent here, or else that it had dissipated, such that no competent officer would have been confused about that topic. Further, the law relating to protection of the home and to the curtilage specifically was sufficiently clear as well.

(Doc. No. 136 at 3).

While the Plaintiff's briefing addresses the constitutionality of certain conduct, he has plainly failed to address the clearly established prong of the qualified immunity analysis. His statements that generally the law is clear without any citation to that law are unpersuasive at best. Under these circumstances, the Court cannot find that the law was clearly established such that no reasonable officer would conclude that he lacked probable cause to believe that Plaintiff was a danger to himself or others. Therefore, even if the Court is found to be wrong on the finding of no constitutional violations, Plaintiff has not met his burden under the clearly established prong, and, the Supervising Officers are entitled to qualified immunity on Plaintiff's Fourth Amendment claims for unreasonable seizure and excessive use of force.

**B. First Amendment Claim**

Plaintiff claims that the events that took place on April 29, 2018, were retaliation against him for his Facebook posts about corruption in Nashville and the need for change. The Supervising Officers assert qualified immunity on this claim as well, and Plaintiff again fails to address the assertion in any meaningful way, stating only that "the same reasons and court holdings for why qualified immunity would not extend to the finding of probable cause would likewise apply here, in the First Amendment context" and refers the Court to his previous arguments regarding probable cause for his arrest. (Doc. No. 136 at 4). Presented with only bare assertions from the Plaintiff, the Court will begin its qualified immunity analysis with the question of whether there was a constitutional violation.

"'As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). A plaintiff may bring a First Amendment claim when "an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences." *Id*. (internal quotations omitted). To prevail on a claim for retaliation, the burden is on the plaintiff to show a "causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Id*. (internal quotations omitted). It is insufficient to show only retaliatory motive and subsequent injury. *Id*. Rather, the plaintiff must show that the motive *caused* the injury. *Id*.

Plaintiff has presented no evidence that the Supervising Officers undertook the actions against him in retaliation for his Facebook comments about corruption in Nashville or for any other comment by any medium. To the contrary, all of the evidence shows that officers went to his house in response to phone calls that reported threatening comments. Viewing his arguments in the most favorable way, the Court could perhaps divine an argument that because the officers lacked probable cause for the detention they were clearly acting with retaliatory animus. This is plainly insufficient under the standard. Plaintiff has not presented any evidence, authority, or even argument to support his allegations of First Amendment retaliation.

The Plaintiff having failed to meet the standard and there being nothing in the record to support the claim, the Court finds that there is no constitutional violation, and the Supervising Officers are entitled to qualified immunity on Plaintiff's First Amendment claim.

### C. *Monell* Liability

Plaintiff brings claims of municipal liability against Metro related to his First and Fourth Amendment Claims. The Court has found that there were no constitutional violations. Accordingly, there can be no municipal liability on Plaintiff's First and Fourth Amendment claims. *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").

### D. State Law Trespass Claims

The Court having found that summary judgment is appropriate on all of the federal claims declines to exercise supplemental jurisdiction over Plaintiff's state law claim against the Subordinate Officers for trespass. *See* 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

In sum, the Court finds that the Supervising Officers are entitled to qualified immunity. The Motion for Summary Judgment (Doc. No. 106) brought by those officers will be **GRANTED** and the federal claims against those officers will be dismissed. Because the Court declines to exercise supplemental jurisdiction over the state law claim, Plaintiff's claim of trespass against the Subordinate Officers will be **DISMISSED**. Finally, because there were no constitutional violations, there can be no municipal liability, and Metro's Motion for Summary Judgment (Doc. No. 107) will be **GRANTED**. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 124) will be **DENIED**.

An appropriate order will enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE